[No. 48689–1. En Banc. August 4, 1983.]

THOMAS BROWN, *as Personal Representative, Petitioner,*
v. SPOKANE COUNTY FIRE PROTECTION DISTRICT
No. 1, *Respondent.*

SPOKANE COUNTY FIRE PROTECTION DISTRICT No. 1,
*Respondent,* v. VICTOR HOLMES,
*Petitioner.*

*Bryan P. Harnetiaux, Malott, Southwell & O'Rourke, Daniel O'Rourke,* and *Ronald Kappelman,* for petitioners.

*Hemovich & Nappi,* by *Joseph Nappi, Jr.,* for respondent.

WILLIAMS, C.J.—This case is a consolidation of two actions brought by petitioners Victor Holmes and the estate of Susan Marie Holmes against the respondent Spokane County Fire Protection District No. 1 (district), seeking damages for wrongful death and personal injuries arising out of a traffic accident in the Spokane Valley. Fol-

lowing an extensive 3–week trial, the jury returned a verdict in favor of respondent on petitioners' wrongful death and personal injury claims and awarded the district $24,402.87 on its counterclaim for property damage done to its fire engine. The trial court entered judgment on the jury's verdict. The Court of Appeals, Division Three, affirmed the trial court judgment in all respects. We likewise affirm.

On April 18, 1976, Victor and Susan Holmes, traveling in a modified 1930 Model A Ford driven by Mr. Holmes, collided with a fire engine operated by a district fireman, Mr. Barry Bucher. At the time of the collision, fireman Bucher was accompanied in the cab by Lieutenant Daniel Bruna. The collision, which occurred at a busy intersection in the Spokane Valley, resulted in the death of Susan Holmes and caused serious injuries to Victor Holmes.

This action was commenced against the district by Thomas Brown, as personal representative of the estate of Susan Holmes, and by Victor Holmes on his own behalf. Petitioners alleged a violation of the district's statutory duty of care under RCW 46.61.035 and RCW 46.61.210.[1]

---

[1]RCW 46.61.035 states in part:

"(1) The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions herein stated.

"(2) The driver of an authorized emergency vehicle may:

". . .

"(b) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

"(c) Exceed the maximum speed limits so long as he does not endanger life or property;

". . .

"(4) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."

RCW 46.61.210 states:

"(1) Upon the immediate approach of an authorized emergency vehicle making use of audible and visual signals . . . the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close

The district disputed any liability and contended Mr. Holmes had been negligent in failing to yield the right of way, using excessive speed, and/or in failing to hear and see the fire engine as it approached the intersection. In addition, the district filed a counterclaim against Victor Holmes for property damage done to the fire engine in the collision.

At trial, a number of factual issues were disputed including the speed of the Holmes vehicle, the speed of the fire engine, and the color of the traffic light for each vehicle. Each side presented evidence on these factual issues, including the testimony of various expert witnesses who formulated opinions about the manner in which the impact occurred. At the conclusion of the evidence, petitioners moved for a directed verdict and partial summary judgment on the issues of liability and the color of the traffic light for the fire engine. The trial court denied these motions. The jury found no negligence on the part of the district, but did find negligence on the part of Mr. Holmes. Consequently, the jury denied recovery to petitioners, but awarded the district $24,402.87 in property damages against Mr. Holmes.

In an unpublished opinion, the Court of Appeals, Division Three, affirmed the trial court. Although the court did find error in the admission into evidence of the district's, alarm room tape recording, it found the error to be non-prejudicial to the outcome of the case. *Brown v. Spokane Cy. Fire Protec. Dist. 1,* 31 Wn. App. 1038 (1982).

Initially, petitioners contend the trial court erred in giving jury instruction 13, which reads:

> Every person using a public street or highway *with ordinary care has the right to assume* that other persons thereon will use ordinary care and will obey the rules of

as possible to, the right–hand edge or curb of the roadway clear of any intersection and shall stop and remain in such position until the authorized emergency vehicle has passed, . . .

"(2) This section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway."

the road, and he has a right to proceed on such assumption until he knows, or in the exercise of ordinary care should know, to the contrary.

(Italics ours.) Clerk's Papers, at 74. Except for the words "with ordinary care", this is the "right to assume" instruction of WPI 70.06, 6 Wash. Prac. 309 (2d ed. 1980). Petitioners argue that this instruction erroneously removed from the emergency vehicle driver the duty to anticipate how his emergency vehicle might affect normal driving patterns. They insist that this is tantamount to giving the emergency vehicle driver the right to conclusively presume that, when the required siren signal and flashing lights are operated, other highway users will yield. Such was the rule under *Lakoduk v. Cruger,* 48 Wn.2d 642, 296 P.2d 690 (1956), but that standard was superseded by the "duty to drive with due regard for the safety of all persons" standard of RCW 46.61.035. We previously have interpreted that statute to impose a traditional "negligence" standard of care on emergency vehicle drivers. *Mason v. Bitton,* 85 Wn.2d 321, 325–26, 534 P.2d 1360 (1975). Petitioners contend the above instruction essentially resurrects the *Lakoduk* rule.

■ We disagree with petitioners' argument. As the Court of Appeals pointed out, jury instruction 13 refers to "every person" and therefore applies to the district as well as Mr. Holmes. Thus, both parties were required to use ordinary care at the time of the accident. The ordinary care standard is then reemphasized in the same instruction by the clause "or in the exercise of ordinary care should know . . ." Clerk's Papers, at 74. Further, this duty was reiterated in jury instruction 11, which provides that: "One is charged with the duty of seeing that which he would have seen had he been exercising ordinary care." Clerk's Papers, at 72.

We recognize that the standards of care charged to the driver of an emergency vehicle and to the driver of an ordinary vehicle, while similar, are not precisely the same. The privileges granted to the driver of an emergency vehicle

under RCW 46.61.035, such as the privilege to proceed past stop signals and the privilege to exceed maximum speed limits, are not available to the driver of an ordinary vehicle. Notwithstanding these provisions, the statute requires the driver of an emergency vehicle to drive with "due regard for the safety of all persons," and further provides that the privileges granted therein do not "protect the driver from the consequences of his reckless disregard for the safety of others." RCW 46.61.035(4). Despite the reference to "reckless" conduct, we believe the Legislature intended to charge the driver of an emergency vehicle with the duty of exercising due regard for the safety of all persons under the existing facts and circumstances. The facts and circumstances of each case include the privileges granted by RCW 46.61.035. Thus, the test of due regard as applied to emergency vehicle drivers is whether, given the statutory privileges of RCW 46.61.035, he acted as a reasonably careful driver.

Under RCW 46.61.210(1), the driver of an ordinary vehicle must yield the right of way to an authorized emergency vehicle making use of audible and visual signals by immediately driving to a position parallel and as close as possible to the right edge of the road, clear of any intersection, and remaining there until the emergency vehicle has passed. Although the emergency vehicle driver cannot be permitted to act on the blind assumption that other drivers will comply with RCW 46.61.210(1), he has the right to assume other drivers will yield the right of way as required by law until it is otherwise apparent. RCW 46.61.035(4) and RCW 46.61.210(2) make it clear that at no point, including the circumstances where another driver fails to yield the right of way, is an emergency vehicle driver relieved of the duty to drive with due regard for the safety of all persons. *See also Boyle v. Emerson*, 17 Wn. App. 101, 108, 561 P.2d 1110 (1977); *Shawnee Township Fire Dist. 1 v. Morgan*, 221 Kan. 271, 278–79, 559 P.2d 1141 (1977). The trial court's jury instruction 9, patterned after RCW 46.61.035, accurately sets forth the applicable law in this area:

Defendant's vehicle was an authorized emergency vehicle. When such an authorized emergency vehicle is responding to an emergency call, and if the siren is being sounded when and to the extent reasonably necessary to warn pedestrians and other drivers of its approach and if the special lights on the vehicle are in operation the driver of the emergency vehicle may exercise the following privileges:

(a) He may park or stand, irrespective of the provisions of the law applicable to motorists generally;

(b) He may proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

(c) He may exceed the maximum speed limits so long as he does not endanger life or property;

(d) He may disregard regulations governing direction of movement or turning in specified directions.

*These exemptions granted to an authorized emergency vehicle do not relieve its driver from the duty to drive with due regard for the safety of all persons under all of the circumstances, including the circumstances of the emergency.*

*In determining whether the driver of the emergency vehicle complied with the "duty to drive with due regard for the safety of all persons" you are instructed that the standard of care in this regard is governed by the instructions defining "negligence" and "ordinary care".*

Except for the privileges enumerated and the conditions here set forth when those privileges may be exercised, the driver of an authorized emergency vehicle is subject to the laws applicable to other drivers.

(Italics ours.) Clerk's Papers, at 70.

■ It is a well established rule that jury instructions must be considered in their entirety. *Braxton v. Rotec Indus., Inc.*, 30 Wn. App. 221, 224, 633 P.2d 897 (1981). Instructions are sufficient if they (1) permit each party to argue his theory of the case, (2) are not misleading, and (3) when read as a whole, properly inform the trier of fact of the applicable law. *State v. Theroff*, 95 Wn.2d 385, 389–90, 622 P.2d 1240 (1980). In the present case, subsections (b) and (c) of the above quoted jury instruction encompassed key issues before the jury. It should be noted, however, that

even those privileges of an emergency vehicle driver are modified by the italicized language regarding the continuing duty of due regard for the safety of all persons. Testimony elicited at trial indicated varying speeds of the vehicles and suggested, depending on the witness, that either vehicle may have entered the intersection on a red light. These were questions of fact for the jury to decide in light of the continuing duty of each driver to exercise due care and regard for the safety of others. When the above instructions are read as a whole, it is clear the jury was accurately and properly instructed on the applicable standards of care. We find no error.

Petitioners next assign error to the trial court's ruling which allowed the jury to hear the alarm room tape recording containing Lieutenant Bruna's account of the incident some 30 to 40 minutes after the accident. The objectionable portion of the tape is as follows:

He [Holmes] come from the north and come through there, and, boy, he come—boy he was really gunboating when he hit that damn thing and he just kept like—I don't know, he was really going when he went through there anyway.

Partial Report of Proceedings, at 539.

■ The Court of Appeals first acknowledged the general rule that audiotapes maintained by law in the regular course of business are admissible as business records under RCW 5.45.020. *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 318, 553 P.2d 423 (1976). Nevertheless the court concluded the above quoted portion of the audiotape should have been excluded because Lieutenant Bruna's account of the incident was a narrative of occurrences antedating the making of the tape and constituted inadmissible hearsay evidence. *See State v. White*, 72 Wn.2d 524, 530, 433 P.2d 682 (1967). Since the recording of Lieutenant Bruna's statements was made some 30 to 40 minutes following the incident, after he had an opportunity to calm down and reflect on the events, the statements fall into neither the old "res gestae" exception nor the ER

803(a)(2) exception for excited utterances. *See State v. Schimmelpfennig,* 92 Wn.2d 95, 99, 594 P.2d 442 (1979). Therefore, the above portion of the tape recording should have been excluded as hearsay. The Court of Appeals went on, however, to find that the admission of the objectionable portion of the tape was not reversible error because the statements were merely cumulative of Lieutenant Bruna's testimony at trial. *See, e.g., Everett v. Diamond,* 30 Wn. App. 787, 792–93, 638 P.2d 605 (1981); *In re Estate of Rakestraw,* 28 Wn. App. 585, 586–87, 624 P.2d 1175 (1981).

■ The question here, then, is whether the error was prejudicial, for error without prejudice is not grounds for reversal. *Thomas v. French,* 99 Wn.2d 95, 104, 659 P.2d 1097 (1983). Error will not be considered prejudicial unless it affects, or presumptively affects, the outcome of the trial. *James S. Black & Co. v. P & R Co.,* 12 Wn. App. 533, 537, 530 P.2d 722 (1975).

Petitioners assert the Court of Appeals finding of harmless error is in conflict with *Day v. Goodwin,* 3 Wn. App. 940, 478 P.2d 774 (1970). That case, however, is distinguishable. While *Day* is similar in that it involves statements made sometime after an accident, the evidence in that case was used quite differently than in the case before us. In *Day,* the defendant sought to introduce the hearsay statements of witnesses, made some 90 minutes after observing an accident, as prior *inconsistent* statements to impeach the testimony of those same witnesses at trial. Here, the taped statement was consistent with the testimony at trial and was not used for impeachment purposes. Therefore, the error affected only the weight, not the inherent truthfulness, of the statements. Given the extensive nature of the trial in this case along with the testimony of various witnesses regarding the relative speed of each vehicle, it is highly unlikely the erroneous admission of this portion of the tape recording affected the outcome of the trial. We find that the evidence, being merely cumulative in nature, was harmless error.

■ Next, petitioners assert the trial court erred in refusing to give their proposed jury instruction on the duty of a person suddenly confronted by an emergency.[2] The essential element to invoke the emergency doctrine is confrontation by a sudden peril requiring instinctive reaction. *Seholm v. Hamilton*, 69 Wn.2d 604, 609, 419 P.2d 328 (1966). The rule is applicable only after a person has been placed in a position of peril and there is a choice between courses of action after the peril has arisen. *Sandberg v. Spoelstra*, 46 Wn.2d 776, 285 P.2d 564 (1955). Further, an emergency doctrine instruction is appropriate only when the trier of fact is presented with evidence from which it could be concluded that the emergency arose through no fault of the party seeking to invoke the doctrine. *Mills v. Park*, 67 Wn.2d 717, 409 P.2d 646 (1966).

> An instruction on sudden emergency is appropriate when the emergency is not brought about, in whole or in part, by the negligence of the party seeking to invoke the doctrine.

(Citations omitted.) *Zook v. Baier*, 9 Wn. App. 708, 714, 514 P.2d 923 (1973). *See also Tobias v. Rainwater*, 71 Wn.2d 845, 859, 431 P.2d 156 (1967).

The emergency doctrine instruction was inappropriate under the evidence in this case and was therefore properly rejected by the trial court. As the Court of Appeals in *Zook v. Baier, supra* at 714, explained:

> The doctrine excuses an unfortunate human choice of action that would be subject to criticism as negligent were it not that the party was suddenly faced with a situation which gave him no time to reflect upon which choice was the best. When, as here, there were not alternatives available but only an instant of time on a slippery

---

[2]The proposed instruction stated:

"In assessing the conduct of Victor Holmes on April 18, 1976, you are instructed that a person, who is suddenly confronted by an emergency through no negligence of his own and who is compelled to decide instantly how to avoid injury and who makes such a choice as a reasonably careful person placed in such a position might make, is not negligent even though he does not make the wisest choice." Clerk's Papers, at 46.

road for a single instinctive reaction, an emergency doctrine instruction was doubly improper.

(Citations omitted.) Similarly, the sudden emergency presented to Mr. Holmes under these facts afforded him no alternative courses of action. He reacted instinctively by swerving to strike the fire engine a glancing blow rather than proceeding forward to strike the fire engine squarely. Since there were no alternative courses of action available to Mr. Holmes other than to strike the fire engine, the emergency doctrine was inapplicable.

Petitioners' next assignment of error concerns the trial court's refusal to compel the taking of testimony from certain jurors on the issue of jury misconduct. Counsel for Mr. Holmes and an assisting attorney submitted affidavits indicating that some jurors had discussed their personal observations of the intersection in question, resulting in one juror changing his or her vote. According to counsel for Mr. Holmes, none of the jurors would voluntarily verify these allegations.

If jury misconduct is capable of objective proof without probing the jurors' mental processes and the trial court, in its discretion, has any doubt that the comments affected the outcome of the trial, the trial court must grant a new trial. *Halverson v. Anderson,* 82 Wn.2d 746, 751–52, 513 P.2d 827 (1973). In the present case, the Court of Appeals noted that of the numerous photographic exhibits admitted at trial, several photographs could enable the jurors to conclude that a person approaching the intersection in question would be able to observe approaching traffic through the glass windows of the building. Under those circumstances, it is highly unlikely that the personal observations of the jurors unduly affected the outcome of the trial. Since petitioners' motion is addressed to the sound discretion of the trial court which had observed all the witnesses and trial proceedings and had in mind the evidence presented, the question becomes whether the trial court judge abused his discretion in refusing to compel jurors to testify about any potential misconduct. *Halverson,* at 752.

We are unable to say the trial court judge abused his discretion in this case in refusing to compel testimony undermining the jury's verdict. Our reasoning on this issue is best summarized by the following quotation from *Cox v. Charles Wright Academy, Inc.*, 70 Wn.2d 173, 177, 422 P.2d 515 (1967):

> True, plaintiff's counsel made an affidavit that, in his telephonic conversations with jurors to ascertain why their verdict had been so low, one juror had told him that young people of today are unworthy of belief because they are not of good moral character. *But, the affidavit of counsel, hearsay in character as it was, cannot be allowed to impeach the verdict of a jury, for impeachment by such means would inevitably place nearly every verdict in jeopardy and promote great uncertainty in the judicial process.*

(Italics ours.)

Next, petitioners assign error to the trial court allowing Battalion Fire Chief Keeling to testify that he could hear a siren at least one–half mile away from the intersection in question. In its unpublished opinion, the Court of Appeals reasoned:

> The admissibility of evidence is largely within the discretion of the trial judge who must weigh the probative value against its prejudicial effect. *Goodell v. ITT–Federal Support Servs., Inc.*, 89 Wn.2d 488, 493, 573 P.2d 1292 (1978). Whether sirens could be heard was an essential issue at trial. All facts tending to establish a theory of a party, or to qualify or disprove the testimony of an adversary are relevant. *Fenimore v. Drake Constr. Co.*, 87 Wn.2d 85, 89, 549 P.2d 483 (1976). The estate questioned virtually every witness in a position to know concerning the ability to hear sirens. We find no error.

Brown v. Spokane County Fire Protection District No. 1, at 11. Apparently, the trial court believed Battalion Chief Keeling's testimony would be helpful to the jury in deciding this important issue and permitted the testimony on this basis. Counsel for petitioners first objected to the testimony at trial as an improper experiment. After counsel for respondent made an offer of proof that Battalion Chief

Keeling's testimony was not based on an experiment, but was based on past experience, the testimony proceeded without a renewal of the improper experiment objection. Thereafter, a second objection was raised to the testimony. The grounds for that objection are unclear, but seem to be based upon a general relevancy objection. Given the importance at trial of the issue of the siren's audibility at the time of the accident, we must conclude Battalion Chief Keeling's testimony was relevant. ER 401 and 403. Counsel for petitioners thoroughly cross–examined the witness on the basis of his knowledge of the audibility of the siren, but offered no other grounds for objection to the testimony. Under these facts, we find there was no error.

Petitioners further contend the trial court erred in impermissibly commenting on the evidence during the cross examination of Mr. William Chronic, a consulting engineer and defense expert witness. Mr. Chronic employed a complex mathematical formula in calculating that the Holmes vehicle was traveling at least 51 miles per hour at the time of the impact. An element in this computation was a forward impact of the vehicles lasting precisely 1 second in duration. Counsel for Mr. Holmes repeatedly attempted to have Mr. Chronic assume the duration of the impact was one–half second rather than 1 second. Mr. Chronic refused to make such an assumption and explained that such an assumption would completely invalidate the equation. He testified the use of a 1–second forward impact was standard procedure in the formula and any other time unit would invalidate the application of the formula. At trial, the following discussion occurred:

THE COURT: [As the] [b]asis for this, the witness has said it would not be correct. That's his statement. MR. HARNETIAUX: Your Honor, again I think we're going to have to go back on this. THE COURT: No witness under oath in this court has to say something he believes is wrong. Maybe from some other witness or some other way, but you're asking him— MR. HARNETIAUX: Can we not ask the witness, Your Honor, of the consequences of a variable that he's plugged, if this variable changes? THE

COURT: Yes, but he has answered it. . . . THE COURT: I think the witness has indicated—if he was to put it, mathematical formula, and carry it out, that's something else, but the point is I don't want a witness who's in this court under oath, to do something, say something that he, the witness says, is not right.

Excerpts from Trial Proceedings, at 13–14. Petitioners allege the above comments by the trial judge insulated Mr. Chronic from legitimate cross examination and constituted a favorable comment on Mr. Chronic's testimony in violation of Const. art. 4, § 16.[3]

In *Egede–Nissen v. Crystal Mt., Inc.,* 93 Wn.2d 127, 141, 606 P.2d 1214 (1980), this court noted:

> A trial judge should not enter into the "fray of combat" nor assume the role of counsel. An isolated instance of such conduct may be deemed harmless error, however, if it cannot be said to violate constitutional bounds of judicial comment. Const. art. 4, § 16. This is particularly true if the response appears invited and represents a natural, limited reaction to an immediate stimulus. In such instances, potential error may be cured by an instruction, if requested.

(Citation omitted.) Such an instruction, consistent with the instruction approved by the court in *Balandzich v. Demeroto,* 10 Wn. App. 718, 725, 519 P.2d 994 (1974), was given to the jury.[4] Whether the trial court denied petitioners' counsel the right to adequately cross–examine Mr. Chronic is an issue not raised in the petition for review and is thus not before this court. We note, however, that any curtailment in the cross examination of Mr. Chronic was likely offset by petitioners' own expert who testified to the con-

---

[3]Const. art. 4, § 16 provides:
"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

[4]Instruction 1 stated in part:
"The law does not permit me to comment on the evidence, and I have not intentionally done so. If it appears to you that I have so commented, during either the trial or the giving of these instructions, you must disregard such comment entirely." Clerk's Papers, at 62.

trary proposition.

Under the circumstances of this case, we are unable to say the trial judge's remarks constituted a favorable comment on the evidence. Rather, it seems the trial judge acted to prevent further confrontation between counsel and the expert witness, each of whom appeared adamant in refusing to compromise their respective positions. Even if this isolated instance could be viewed as a comment on the evidence, the trial court properly followed the guidelines of our opinion in *Egede–Nissen,* by giving a curative jury instruction. We find no error.

Petitioners next assign error to the trial court's ruling that limited inquiry into defense counsel's past business relationship with Mr. Chronic. Counsel for petitioners sought to raise the issue of bias in demonstrating Mr. Hemovich's minority shareholder status in a company formed to manufacture products in connection with patents held by Mr. Chronic. The following conversation took place at a bench conference after an objection to that line of questioning:

> MR. HEMOVICH: I don't want the jury to hear this. I happen to be a minority stockholder in a corporation that was going to manufacture jet pumps. This was some time ago. They were the steer jet pumps which he was the engineer. That's how I happened to meet him to begin with, Your Honor, but that's the extent of it and I think this is the kind of thing that is of no consequence at all. I don't know— THE COURT: Is that what you're looking for? MR. HARNETIAUX: You bet. It goes to the relationship. THE COURT: You have already demonstrated by the number of times he has testified, haven't you? MR. HEMOVICH: I think he has. MR. O'ROURKE: He hasn't demonstrated any financial connection. MR. HEMOVICH: There's no financial connection whatsoever, Judge.

Partial Report of Proceedings, at 839–40.

■ Cross examination to show bias is a matter of right, but the scope and extent of such cross examination rests in the sound discretion of the trial court judge. *Dods v. Harrison,* 51 Wn.2d 446, 448, 319 P.2d 558 (1957); *State v.*

*Swanson,* 16 Wn. App. 179, 554 P.2d 364 (1976). It was established at trial that Mr. Chronic had testified as an expert for Mr. Hemovich on numerous occasions in the past. The business relationship regarding Mr. Hemovich's ownership of stock in Mr. Chronic's business was collateral to the bias issue—at least as to Mr. Chronic's inclination to be biased in his capacity as an expert witness. The remoteness of this financial interest coupled with the more important showing of the use of Mr. Chronic's employment as a defense expert witness on several previous occasions lead us to conclude petitioners were afforded ample opportunity to expose to the jury Mr. Chronic's bias toward the defense. We find no abuse of discretion.

■ Finally, petitioners allege error in the trial court's failure to find the district negligent as a matter of law by not granting either a directed verdict or partial summary judgment. The rationale underlying summary procedures is to eliminate trials where only questions of law remain to be determined. *See Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982); *Barrie v. Hosts of Am., Inc.,* 94 Wn.2d 640, 618 P.2d 96 (1980); CR 56(c). In the present case, several factual issues bearing on the question of negligence were in dispute. For instance, conflicting evidence tended to indicate that either side could be negligent depending on the speed of the vehicles, color of the traffic signals, audibility of the siren signal, and so on. In light of these factual disputes bearing on the ultimate issue of negligence, the trial court properly denied summary judgment.

For all of the foregoing reasons, we affirm the Court of Appeals and the judgment of the Superior Court.

STAFFORD, UTTER, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

Reconsideration denied October 17, 1983.