MARLENE A. BOWERS, *Individually and as Personal Representative, Respondent,* v. FIBREBOARD CORPORATION, ET AL, *Appellants.*

FLORENCE ELDREDGE, ET AL, *Respondents,* v. FIBREBOARD CORPORATION, ET AL, *Appellants.*

*John E. Carlson;* and *Paul J. Kundtz* and *Riddell, Williams, Bullitt & Walkinshaw,* for appellant Fibreboard Corporation.

*Steven T. Johnson* and *Kathleen Garvin,* for appellant Owens-Illinois Corporation.

*Mark S. Clark* and *Hillis Clark Martin & Peterson (C. Lawrence Rayburn,* of counsel), for appellant Celotex Corporation.

*Kristin M. Houser, Kirk I. Mortensen, William Rutzick,* and *Schroeter, Goldmark & Bender P.S.,* for respondents.

SEINFELD, J. — Elbert Eldredge and Richard Williams died following exposure to asbestos-containing products. Appellants brought these two actions incorporating survival and wrongful death claims. Prior to trial, the Eldredge survival action was dismissed. The trial court consolidated the

remaining matters for trial by jury. The jury found all defendants liable and awarded damages to the plaintiffs. Defendants appealed each case separately, but all assigned error to the same "claims" instruction. In addition, defendants present separate, individual challenges to certain evidentiary rulings.[1] We again consolidate these two cases for the purpose of this decision, find no error, and affirm.

The facts of each case will be dealt with separately.

### ELDREDGE

American Marine Bank is the personal representative of the estate of Elbert Eldredge. Florence Eldredge is his widow. Mr. Eldredge served as a water tender, fireman and boiler tender in the United States Navy from 1927 to 1947, and worked as a boilermaker and pipefitter at the Puget Sound Naval Shipyard from 1951 to 1963. During this time he was exposed to asbestos-containing products manufactured or sold by defendants. On March 22, 1983, Eldredge was diagnosed with mesothelioma, a disease characterized by tumors on the lung, and he died approximately 4 months later on July 13, 1983, at the age of 73. It is undisputed that his mesothelioma was caused by exposure to asbestos.

### WILLIAMS

Marlene Bowers is the personal representative of the estate of her stepfather, Richard Williams. Williams was a boilermaker in the United States Navy from 1946 until June 1962 and worked in the Puget Sound Naval Shipyard from 1977 to 1986. He served on the U.S.S. *Manchester* between 1946 and 1950 and on the U.S.S. *Iowa* in 1952 during the Korean war. Williams died in 1986 of mesothelioma. Here, also, it is undisputed that the cause of the mesothelioma was asbestos exposure.

The defendants manufactured asbestos products used as insulation on Navy ships. Navy boilermakers came into con-

---

[1] An order was entered on November 2, 1990, indefinitely staying the appeal of Celotex Corporation, one of the original defendants, due to pending bankruptcy proceedings. Therefore, we will not discuss the three issues raised by Celotex in these two cases.

tact with such products when removing insulation from pipes and valves to prepare them for inspection and repairs. They also combined asbestos powder and water to create a compound for small repairs.

## JURY INSTRUCTION

In both cases, defendants contend that the trial court erred in giving instruction 8, the "claims" instruction, which plaintiffs submitted. They argue that the instruction was misleading as to their legal duty and was an improper comment on the evidence. Instruction 8 advises the jury that the plaintiffs have two separate theories of liability: design defects and negligent failure to warn. It also identifies seven specific ways in which the defendants were negligent, stating:

plaintiffs contend that the defendants were negligent in one or more of the following aspects:
1. Failure to test their products;
2. Failure to remove their products from the market in a timely fashion;
3. Failure to remove or reduce the asbestos content of their products in a timely fashion;
4. Using asbestos in their products;
5. Failure to inform users of handling methods;
6. Failure to warn foreseeable product users (including persons exposed to dust from the product) of the dangers of asbestos;
7. Failure to keep abreast of research and knowledge in the field as to the dangerousness of the products.
The plaintiffs claim that one or more of these acts was a proximate cause of injuries and damage to Richard Williams and Elbert Eldredge.

Defendants argue that the instruction improperly allowed the jury to infer negligence if it found that the product manufacturers engaged in any of the conduct listed in the instruction. They contend that such an inference is contrary to the Washington products liability act which lists acts of negligence that create manufacturer liability: negligent construction, negligent design, or negligent failure to provide adequate warnings or use instructions. RCW 7.72.030.

■ Trial courts have considerable discretion in deciding how jury instructions will be worded. *See Connor v. Skagit*

*Corp.*, 30 Wn. App. 725, 731, 638 P.2d 115 (1981), *aff'd*, 99 Wn.2d 709, 664 P.2d 1208 (1983). Jury instructions are not erroneous if they "(1) permit each party to argue his [or her] theory of the case, (2) are not misleading, and (3) when read as a whole, properly inform the trier of fact of the applicable law." *Brown v. Spokane Cy. Fire Protec. Dist. 1*, 100 Wn.2d 188, 194, 668 P.2d 571 (1983). After reviewing the jury instructions in this case as a whole, we find no error.

Admittedly, instruction 8 is not well organized and, consequently, lacks precision. Nonetheless, all of the seven "claims" of plaintiffs are relevant to the case and were properly before the jury. The defense to the charge of failure to warn was generally "state of the art". In other words, the defendants claimed that they could not have warned potential users of their products of the health hazards presented because they were unaware of those hazards. Several of plaintiffs' claims set forth in instruction 8 rebut that defense. For example, claims 1 and 7 state that defendants failed to test their products or keep abreast of research. Plaintiffs argued that defendants would have known of the need to warn had they engaged in these activities. Claims 3 and 4, failing to reduce the asbestos content in products and using asbestos, are actually part of the strict liability-design defect theory and are misplaced under the negligent failure to warn heading. Although these issues were not artfully placed within the instruction, they, too, were properly before the jury.

Defendants argue that the jury might have found them negligent simply because they failed to test and stay current with research. They also suggest that they were prejudiced by the mislabeling of a strict liability issue as one of negligence. If the jury was required to rely on instruction 8, standing alone, defendants' concerns would be well taken. However, the court advised the jury that instruction 8 was merely a summary of the claims and that the claims were outlined solely to aid the jury in understanding the issues.

The specific law to be applied was presented in additional instructions: number 10, the law of strict liability for design defects; number 11, the law governing a manufacturer's liability for negligent failure to warn; number 15, the common law definition of negligence; and number 16, the duty of ordinary care. Looking at the instructions as a whole, we conclude that the parties were able to argue their theories of the case, the instructions were not misleading, and they properly informed the jury of the applicable law. *Brown v. Spokane Cy. Fire Protec. Dist. 1, supra.*

### EVIDENCE OF PREILLNESS RELATIONSHIP

Mrs. Eldredge brought this action seeking compensation both for her loss due to the wrongful death of her husband, RCW 4.20.010, and a survival action pursuant to RCW 4.20.060, for the amount owing to the decedent's estate for the injuries he sustained. The court dismissed the latter survival action because the statute of limitations barred the claims.

To establish her damages, Mrs. Eldredge presented evidence of the warm relationship she had with her husband before he became ill: how they met (it was a second marriage for both), the activities they enjoyed together (traveling to various sites of interest to members of the Mormon church and other missionary projects), and his ties to her children and grandchildren. Mrs. Eldredge also described the impact on her life of her husband's absence. The defendants objected to the above testimony on relevancy grounds, arguing that the evidence should have been limited to Mr. Eldredge's contributions to the marriage in the time period immediately preceding his death, after the onset of his illness. Defendants now argue that the admission of the preillness relationship evidence constituted prejudicial error. On this issue as well, we find no error and affirm the trial court.

A trial court's rulings on the admissibility of evidence are reviewed under the abuse of discretion standard. Absent

a showing of a manifest abuse of that discretion, we will not disturb an evidentiary ruling. *See Brouillet v. Cowles Pub'g Co.*, 114 Wn.2d 788, 791, 791 P.2d 526 (1990).

■■ The wrongful death statute, RCW 4.20.010, and the survival statute, RCW 4.20.060, create two separate and distinct causes of action. *Grant v. Fisher Flouring Mills Co.*, 181 Wash. 576, 44 P.2d 193 (1935). The purpose of the wrongful death statute is to compensate certain relatives of the deceased for injuries to their pecuniary interest, suffered as the result of the wrongful death. *See Gray v. Goodson*, 61 Wn.2d 319, 378 P.2d 413 (1963). Pecuniary interest includes, in addition to monetary contributions, compensation for the loss of other services such as the " 'love, affection, care, companionship, society, and consortium' " of the deceased spouse. *Parrish v. Jones*, 44 Wn. App. 449, 453, 722 P.2d 878 (1986) (quoting *Myers v. Harter*, 76 Wn.2d 772, 783, 459 P.2d 25 (1969)). On the other hand, the RCW 4.20.060 survival action allows the personal representative, acting on behalf of certain specified surviving relatives, to recover for the decedent's damages, including any pain and suffering between the time of the injury and the time of death. *See Walton v. Absher Constr. Co.*, 101 Wn.2d 238, 676 P.2d 1002 (1984). In other words, "the survival statutes continue the cause of action of the decedent for the damages which the decedent could have claimed had the death not occurred." *Parrish*, 44 Wn. App. at 454-55.

The distinction between the two actions does not mean, however, that evidence of the decedent's preillness contributions of time, energy, and emotional support to the relationship is irrelevant to the loss sustained by the surviving spouse under the wrongful death claim. The beneficiaries in such actions are entitled to compensation for their own losses from the untimely death of a family member. Logically, the proper way to demonstrate those losses is, as the trial court recognized, to allow plaintiffs to present evidence showing what the relationship would have been like but for the wrongful conduct of the defendant. In this case, the

defendants' conduct proximately caused Mr. Eldredge's illness and then his death. Therefore, it was appropriate to tell the jury about the ways in which the decedent contributed to the quality of the life of the marital community, and, presumably, would have continued to contribute, absent the defendant's tortious conduct. To hold otherwise would thwart the intent behind the wrongful death statute. See *Gray*, 61˙Wn.2d at 324 (statute is remedial in nature and should be liberally construed).

The defendants have not shown that the trial court abused its discretion. To the contrary, the trial court carefully exercised its discretion. Noting that it had dismissed the survival action, the court carefully screened any evidence of the decedent's pain and suffering from the jury. There was no error.

HEARSAY ISSUE

■ In Bowers' case, the defendants assign error to the trial court's decision to admit excerpts from the United States Navy publication, *Dictionary of American Naval Fighting Ships,* under the "ancient document" exception to the hearsay rule, ER 803(a)(16). Again, our review is for abuse of discretion and we find no such abuse. *Brouillet v. Cowles Pub'g Co., supra.*

Bowers sought to admit the excerpts to establish that the ships on which Williams served were in specific ports at a time when defendants' products were used on ships in those ports. One such excerpt, which the court admitted as an exhibit, stated that the *Manchester* was "laid down" in the Fore River Shipyard in Quincy, Massachusetts, in 1944 and launched in March 1946. Another excerpt, read into the record but not admitted as an exhibit, stated that the *"Iowa* departed from Yokosuka, Japan 19 October 1952 for overhaul at Norfolk." The deposition testimony of certain shipyard workers put defendants' products in the Fore River Shipyard at the time the *Manchester* was built, 1944, and at the Norfolk Naval Shipyard between 1942 and 1975. A

worker at Norfolk stated that he worked on the *Iowa* during this time period.

■ Defendants contend that these excerpts do not fit under the hearsay rule's ancient document exception. They argue, rather, that the *Dictionary of American Naval Fighting Ships (Dictionary)* is more like a "learned treatise" that might be admissible under ER 803(a)(18) if called to the attention of a testifying expert, but that no such expert was presented in this case. We find, however, that the "ancient document" exception is broad enough to encompass these particular excerpts and that this ruling meets the purpose of the hearsay rule and the policies underlying the "ancient document" exception.

ER 803(a)(16) states:

> The following are not excluded by the hearsay rule, even though the declarant is unavailable as a witness:
>
> . . . .
>
> (16) . . . Statements in a document in existence 20 years or more whose authenticity is established.

Evidence is authentic if it is in fact what its proponent claims. ER 901(a), (b)(8). The defendants do not argue that the *Dictionary* is not authentic or that the portions admitted are less than 20 years old. In any event, the *Dictionary* in question is self-authenticating. ER 902. The rule does not require extrinsic evidence of authenticity as a condition precedent to admissibility for books, pamphlets, or other publications purporting to be issued by a public authority. ER 902(e). The title page of the *Dictionary* announces that its source is the Navy Department, Office of the Chief of Naval Operations.

The purpose of the rule prohibiting the use of hearsay testimony, except in limited circumstance, is to increase the probability that evidence shall be trustworthy and reliable. *Chmela v. Department of Motor Vehicles*, 88 Wn.2d 385, 392-93, 561 P.2d 1085 (1977). Certain categories of statements, including ancient document evidence, contain independent indicia of reliability and, thus, are excepted from the hear-

say prohibition. E. Cleary, *McCormick on Evidence* § 253 (3d ed. 1984); ER 803(a)(1)-(23).

The requirement that an "ancient document" be at least 20 years old when offered enhances the probability that it will be trustworthy. First, the lengthy time period between preparation of the document and litigation provides assurance that the work was not fabricated in anticipation of litigation. In addition, in a case such as this, the 20 years between publication and the use of the *Dictionary* at trial provided readers an extended opportunity to point out any errors and suggest corrections to the information.

■ Necessity is the second policy reason for admitting certain hearsay evidence. 5 J. Wigmore, *Evidence* § 1420 (1974). As living witnesses to historical events are difficult to find, the trier of fact likely will lose the benefit of such evidence entirely if not admissible under an exception to the hearsay rule. 5 J. Wigmore § 1421. Furthermore, we recognize that the difficulty of assembling the pieces necessary to tell the entire story about an incident that occurred more than 20 years ago may be so great that the evidence is practically, though perhaps not technically, unavailable.

In support of their contention that ER 803(a)(18), the "learned treatise" exception, rather than the ER 803(a)(16) "ancient document" exception, should apply, defendants cite *Most Worshipful Prince Hall Grand Lodge v. Most Worshipful Universal Grand Lodge*, 62 Wn.2d 28, 381 P.2d 130, *cert. denied*, 375 U.S. 945 (1963). However, *Prince Hall Lodge* is distinguishable. The evidence at issue there involved several books introduced by both parties on the history of what was then called "colored Masonry". The trial court admitted all but one of the books into evidence, apparently under a then existing exception to the hearsay rule for treatises dealing with events of general history. Appellants challenged the trial court's exclusion of the one book: a supplement to a treatise written by a person other than the author of the treatise. The reviewing court noted that, in contrast to the works that the trial court admitted, in this

464

one case the proponent did not qualify the book's author or provide any other basis for considering the work an authoritative history. Therefore, it was not an abuse of discretion to refuse to admit it. *Prince Hall Lodge*, 62 Wn.2d at 42.

Defendants argue that Bowers, likewise, offered no testimony in support of the *Dictionary* excerpts. However, a testimonial foundation, although required for admission of evidence from learned treatises, ER 803(a)(18), is not demanded by the rule excepting ancient documents. ER 803-(a)(16). We need not decide the remaining question, whether the trial court must exclude a properly authenticated 20-year-old document absent additional evidence of its reliability, because here we do have such evidence. In deciding whether to admit the *Dictionary*, the trial court properly considered a letter offered by plaintiff from the head of the Ships' Histories Branch of the Department of the Navy. (The trial court must make the preliminary determination as to the admissibility of challenged evidence. ER 104(a). In doing so, the trial court is not bound by the Rules of Evidence. ER 104(a)). The letter stated that the *Dictionary*, an official publication, is contained in many reference libraries and that it has been "well-received" and "favorably reviewed" and that its primary sources are documents in the Naval Historical Center and National Archives.

In contrast to the treatise supplement by an unrecognized author in *Prince Hall Lodge*, the *Dictionary* is a government publication, compiled from data contained in government archives, maintained in numerous libraries, and reviewed by several journals. This combination of facts increases its probability of reliability and supports the admission of the *Dictionary* as an authoritative history.

Furthermore, there is no reason to exclude compilations of data such as those contained in the *Dictionary* from the term "ancient document". One commentator, referring to the

"ancient document" exception to the hearsay rule, ER 803-(a)(16), states:

> Nothing in the rule restricts its application to dispositive instruments such as deeds. The text of the rule is broad enough to include other documents, apparently including newspapers and treatises. Nothing in the rule requires that the author of the document be established as an expert.

(Footnotes omitted.) 5B K. Tegland, Wash. Prac., *Evidence* § 382 (3d ed. 1989).

Finally, defendants suggest that it is arbitrary to eliminate the additional foundational requirements for admission of a learned treatise merely because the document has reached the age of 20. We recognize that the selection of a specific time period for the general application of ER 803(a)(16) involved some subjective judgment. However, the fundamental reasons for the rule, necessity and high degree of reliability, encompass the inclusion of the *Dictionary* in this case. Further, the trier of fact can understand and utilize the *Dictionary*, a compilation of facts rather than a treatise of analysis, opinion, and theory, without expert interpretation. The testimony of an expert witness regarding his or her use of this text would add little.

The court acted within its discretion in admitting these *Dictionary* excerpts as "ancient documents".

We affirm the trial court except with regard to those issues pertaining only to Celotex Corporation, which issues await resolution at such time as the bankruptcy court lifts the stay of appeal.

PETRICH, C.J., and MORGAN, J., concur.

Review denied at 120 Wn.2d 1017 (1992).